BEFORE
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

NIGHT BOX
FILED

OCT 1 5 1999

CARLOS JUENKE
CLERK, USDC/SDFL/FTL

|  |  |  |
|---|---|---|
| **LAKER AIRWAYS INC.** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Case No. 97-6766-CIV-FERGUSON |
| v. | ) | Magistrate Judge Snow |
| | ) | |
| **BRITISH AIRWAYS PLC.** | ) | |
| **AIRPORT COORDINATION LTD.** | ) | |
| | ) | |
| Defendants | ) | |

## AMENDED COMPLAINT

Plaintiff, Laker Airways Inc. ("Laker"), sues Defendants, British
Airways Plc. ("BA") and Airport Coordination Limited ("ACL"), under the
antitrust laws of the United States and of the State of Florida for combining
and conspiring to restrain and to monopolize scheduled passenger air service
between Miami, Florida and London, England, and also under Florida state
law for unfair methods of competition.  Laker demands treble damages, and
attorney's fees and costs.  Laker alleges as follows:



2

**Parties**

1.  Laker is a Delaware Corporation with its principal place of business in Fort Lauderdale, Florida.  Laker is licensed by the United States Government and the Government of the United Kingdom ("U.K.") to operate scheduled air passenger service, inter alia, between Miami, Florida, and London, England.  Laker provided Miami-London service commencing in March 1997 in competition with BA. Virgin Atlantic Airways and American Airlines.  Laker was restricted to serving London via the Gatwick Airport ("Gatwick").

2.  BA is a corporation incorporated in the United Kingdom with its principal place of business in Hounslow, Middlesex, England.  BA is licensed by the United States Government and the U.K. to operate scheduled air passenger service, inter alia, between Miami, Florida, and London, England. BA is permitted to serve between Miami, Florida, and both Gatwick and London's Heathrow Airport.

3.  ACL is a corporation incorporated in the United Kingdom with its principal place of business in Hayes, Middlesex, England.  ACL allocates, and at all times material hereto allocated the landing and take-off slots of British airports.  The United Kingdom Government has no role in the allocation process.

3

**Jurisdiction and Venue**

4.  This court has original jurisdiction pursuant to 28 U.S.C. § 1331

and § 1337 since this civil action arises under an Act of Congress protecting

trade and commerce against restraints and monopolies, the Sherman

Antitrust Act as amended, 15 U.S.C. §§ 1 and 2, and Laker seeks relief

under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  The

court also has pendent jurisdiction over Laker's claims under the Florida

Antitrust Act, Fla. Stat. §§ 542.15 et seq. and the Florida Deceptive and

Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq.  The alleged

violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,

have had a direct, substantial and reasonably foreseeable adverse effect on

both the export and import trade and commerce of the United States and of

both U.S. and foreign persons engaged in such trade and commerce within

the meaning of the Foreign Trade Antitrust Improvements Act of 1982 (as

codified at 15 U.S.C. § 6a).

5.  BA and ACL are aliens.  Pursuant to 28 U.S.C. § 1391(d), this

action may be brought in any judicial district.  BA does business regularly in

this judicial district.  ACL conspired with BA and engaged in tortious activity

which caused injury within Florida.  BA and ACL reasonably foresaw that

their acts would have an effect within Florida and voluntarily participated in

their conspiracy with knowledge of their acts in and their effects within

4

Florida. ACL is subject to the jurisdiction of courts in Florida pursuant to section 48.193(1)(b), Florida Statutes. The court has personal jurisdiction over BA and ACL. Venue in this court is proper.

### Co-Conspirators

6. BA conspired with ACL and other unnamed co-conspirators to restrain and to monopolize the trade or commerce in issue.

### The Market

7. The relevant market is air passenger service between Miami, Florida, and London, England.

8. Many Miami-London air travelers begin or end their air journeys at places beyond London and/or beyond Miami. In order to compete effectively in the Miami-London market, an air carrier must be able to schedule its flights to arrive at a time that enables its passengers to make connections to points beyond Miami or London.

9. Passengers in the market traveling eastbound prefer to arrive at London between 6:00AM and 8:55AM (local time). This enables connecting passengers to make their onward connections and affords local passengers destined for London a full day of activity. In the westbound direction,

5

passengers prefer to depart London between 10:00AM and 12:55PM (local time).  This enables connecting passengers to make their onward connections at Miami to the Caribbean, to Central and South America, and to points in the United States west of Miami.  Departure from London in this time period enables visitors to Miami to find their hotels before dark.

10.    BA has long been entrenched in the Miami-London market and enjoys substantial market power therein.  BA has been serving this market continuously with nonstop flights for decades.  BA is the largest airline in Europe.  BA has an unequaled network of flights between London and points east and south of England.  BA has a highly desired frequent flier program.  BA has had access to London's Heathrow Airport for decades, and has its own terminal facilities at Heathrow.

11.  BA has entered into interline ticketing and baggage agreements with some 150 airlines.  These agreements enable BA passengers to buy a ticket from BA which is accepted on other airlines.  These agreements enable BA passengers to have their baggage automatically transferred between BA flights and flights of other airlines on a single baggage check.  In order to compete effectively in the Miami-London market, an operator must have an interline passenger and ticketing agreement with BA including joint rates with

6

a fair proportionate share of the joint rate for each airline, and arrival times that are compatible with flight departures to other cities.

## Unlawful Acts

12.  For the benefit of BA, the U.K. Government insisted that the United States Government accept restrictions on the ability of U.S. carriers to compete with BA as the price of gaining access to the territory of the U.K. Among those restrictions was the requirement that only two U.S. carriers would be allowed to operate nonstop air service between Miami and London. For BA's benefit, the U.K. Government also restricted to two the number of U.S. carriers permitted to serve London's Heathrow Airport where there is effective connecting air service to and from points beyond London by BA and numerous other airlines.  Laker is not one of the two U.S. carriers named to serve Heathrow.  Thus, Laker was restricted to Gatwick Airport which has less connecting air service than Heathrow to and from points beyond London.  American Airlines, the first U.S. carrier on the Miami-London route, is one of the two U.S. carriers named to serve Heathrow Airport.  The other is United Airlines.  The two British airlines serving Miami-London, BA and Virgin, are the two U.K. carriers named to serve Heathrow.  As a result, Laker was the only Miami-London operator limited to serving London via Gatwick.

7

13.  The U.K. decides the number of landings and take-offs at Gatwick in an hour.  Each movement is called a "slot".  During 1997, the U.K. varied the number of total slots in each hour from a low of 40 slots between 4:00PM and 4:55PM (local time) to 49 slots between 9:00AM and 9:55AM (local time).  In the period required for a competitively timed transatlantic arrival at Gatwick (6:00AM through 8:55AM, local time), the U.K. had established the following slots per hour at Gatwick:

| Local time | Number of Slots |
|---|---|
| 6:00AM to 6:55AM | 42 |
| 7:00AM to 7:55AM | 48 |
| 8:00AM to 8:55AM | 48 |

In the period for competitive transatlantic departure (10:00AM to 12:55PM, local time), the U.K. had established the following:

| Local time | Number of Slots |
|---|---|
| 10:00AM to 10:55AM | 49 |
| 11:00AM to 11:55AM | 45 |
| 12:00PM to 12:55PM | 43 |

14.  ACL as "Coordinator" is solely responsible for the allocation of slots at Gatwick.  ACL is required by EC Regulation to act, and does act, independently of the U.K. Government.  The U.K. Government's responsibilities to ACL are limited to confirming ACL's appointment as Coordinator and ensuring that it continues to act in a manner independent of

8

the U.K. Government.  BA is the principal shareholder of ACL.  At all times

material, Richard Wyatt served as the Chairman of ACL while acting as BA's

General Manager, Routes, Schedules and Strategy.  Peter Morrisroe was on

leave from BA to be the Managing Director of ACL.  At all times material,

Morrisroe was subject to the supervision of Wyatt, in his capacity as

Chairman of ACL.  British Airways has effective control of ACL.


   15.  ACL assigned for summer 1997 more Gatwick slots to BA and its

subsidiary airlines than to any other airline by a wide margin.  BA

manipulated its slots by transferring them among its owned or controlled

airlines so that no slots are available to Laker during the morning hours,

which is the period for competitive arrivals and departures.  For example, BA

assigned Gatwick slots to a franchisee, Airline Management Ltd., for

scheduled operations between London and Tampa, Florida, and between

London and San Juan, Puerto Rico.


   16.  BA controlled 30,858 slots, or approximately 46% of the summer

1997 slots at Gatwick during the hours of operation at Gatwick that are

most desirable for effective service between Miami and London.  BA and its

subsidiaries held the following percentage of Gatwick slots per hour.

9

| Local time | Percentage Held BY BA and Subsidiaries |
|---|---|
| 6:00AM to 6:55AM | 30% |
| 7:00AM to 7:55AM | 59% |
| 8:00AM to 8:55AM | 54% |
| 9:00AM to 9:55AM | 45% |
| 10:00AM to 10:55AM | 49% |
| 11:00AM to 11:55AM | 43% |
| 12:00PM to 12:55PM | 38% |

The balance of the slots were held by over 100 airlines.  The next largest

holder after BA was a charter operator, Caledonian Airlines, which held 5%.


17.  BA and its co-conspirators had and continue to have the power to

exclude Laker, BA's competitor, from obtaining slots at Gatwick that are

necessary to compete effectively in the Miami-London market.  BA and its

co-conspirators exercise that power to foreclose Laker from effectively

competing in the Miami-London market.  For example, Laker requested the

creation of two additional slots, an arrival slot around 6:15AM and a

departure slot around 10:30AM, which was refused, although new slots

were created in the past for other airlines.


18.  Laker was designated by the U.S. as the second U.S. airline to

compete on the Miami-London route in early May 1996.  While under the

terms of the U.S.-U.K. Air Services Agreement, the U.K. was obligated to

authorize Laker to compete fairly and equally with BA, the U.K. delayed

10

granting Laker authority to operate Miami-London scheduled service until

August 1996 when it issued a license to Laker which expired on September

30, 1996. Laker was advised that during September 1996, a new permit for

the Miami-London route would be issued automatically authorizing service

from October 1, 1996 and expiring March 31, 1997.

19. ACL required that applications for slots at Gatwick during the

summer of 1997 be submitted to ACL in September 1996. Based on the

airlines' requests in September 1996, ACL requested the U.K.'s Air Traffic

Control to establish slots per hour to accommodate demand. In September

1996, Laker did not even hold authority from the U.K. authorizing Laker to

operate Miami-London service during the summer 1997. In any event, Laker

was unable, due to the delay by the U.K. in issuing any authority to operate

Miami-London service, to accomplish the huge task of planning daily Miami-

London scheduled air service operation in time to apply for slots at Gatwick

in September 1996. Laker applied as expeditiously as possible. Laker

requested slots at commercially viable and competitive times: arrival around

6:15AM and departure around 10:30AM (local time). Laker's request was

rejected by ACL. ACL refused to assign Laker any slots at all on numerous

days. On the days that slots were assigned, ACL assigned Laker slots at

different times of the day. ACL assigned Laker slots for later than the

commercially viable times for transatlantic arrivals and departures that forced

11

Laker's passengers to arrive in Miami after dark and after the connecting flights from Miami had departed.  Laker's assigned slots precluded effective competition with BA.  Despite numerous requests for assignment of commercially viable slots, Laker was unable to operate at times that permit effective competition in the Miami-London market until after Laker was driven from the market and lacked the resources to compete with BA.

20.  While BA had entered into interline ticketing and baggage agreements with its transatlantic airline competitors (American Airlines, United Airlines, Virgin Atlantic, TWA, Continental, etc.), BA refused to enter into an interline ticketing and baggage agreement with Laker in a timely manner despite repeated appeals to BA.  Laker was unable to hold out the ability to ticket a passenger and his baggage to points beyond London via direct interline transfer on the same ticket and the same baggage check. Because of BA's refusal to enter into a ticketing and baggage agreement, Laker had to issue two tickets to its passengers and advise its eastbound passengers that they must claim their baggage at Gatwick, take it to BA, and check their baggage in with BA.  When, subsequently, BA entered into a form of interline agreement, BA refused to include a reasonable joint-rate agreement which undermined the economic utility of the interline agreement by requiring Laker to pay BA excessive and unreasonable amounts for BA's share of the through fare.

12

21   In 1985, BA entered into an agreement with Laker's minority shareholder, Sir Freddie Laker, which requires BA to deal fairly with an airline in which Sir Freddie has a substantial interest.  Sir Freddie made a fruitless demand on Robert Ayling, BA's chief executive, that BA should comply with this agreement and enter into an interline passenger ticketing and baggage agreement with Laker including reasonable joint rates.   BA discriminated against Laker for the purpose of denying Laker the ability to compete fairly with BA.  BA is engaging in unfair competitive practices with Laker.

## COUNT I

### Section 1 of the Sherman Act

22.  Laker repeats and realleges all of the foregoing allegations.

23.  BA and ACL have combined and conspired to restrain trade and commerce in the relevant market for air passenger service between Miami and London, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  The resulting unlawful combination and conspiracy has, in fact, unreasonably restrained competition in said market to the detriment of not only Laker but the consuming public generally, and will continue to do so unless and until enjoined by this court.  Laker has suffered injury to its business and property, and has suffered antitrust injury, as a direct and

13

proximate result of the aforesaid violation, and will continue to suffer such injury unless and until enjoined by this court.

## COUNT II

### Section 2 of the Sherman Act: Conspiracy to Monopolize

24.  Laker repeats and realleges all of the foregoing allegations.

25.  BA and ACL have combined and conspired to monopolize trade and commerce in the relevant market for air passenger service between Miami and London, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  The resulting unlawful combination and conspiracy has, in fact, enhanced BA's considerable market power in said market and has suppressed competition therein to the detriment of not only Laker but the consuming public generally, and will continue to do so unless and until enjoined by this court.  Laker has suffered injury to its business and property, and has suffered antitrust injury, as a direct and proximate result of the aforesaid violation, and will continue to suffer such injury unless and until enjoined by this court.

14

## COUNT III

### Section 2 of the Sherman Act: Monopolization

26.  Laker repeats and realleges all of the foregoing allegations.


27.  BA possesses monopoly power over the relevant market for air passenger service between Miami and London.  BA is engaged in predatory, exclusionary and anticompetitive conduct with the purpose and effect of raising barriers to entry and foreclosing effective competition in said market, aimed particularly at severely handicapping Laker's ability to become an effective competitor therein.  BA is thereby unlawfully maintaining its monopoly power over said market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  BA's unlawful conduct has suppressed competition in said market to the detriment of not only Laker but the consuming public generally, and will continue to do so unless and until enjoined by this court. Laker has suffered injury to its business and property, and has suffered antitrust injury, as a result of the aforesaid violation, and will continue to suffer such injury unless and until enjoined by this court.


## COUNT IV

### Section 2 of the Sherman Act: Essential Facilities

28.  Laker repeats and realleges all of the foregoing allegations.

15

29.  BA and ACL control access to Gatwick slots.  Gatwick slots are required to operate flights to and from Gatwick airport and thus are essential to competing effectively in the Miami-London market.  Laker cannot practically or reasonably operate services in the market for air passenger service between Miami and London without competitively-timed Gatwick slots.

30.  Laker had repeatedly requested slots at competitive times without success.  BA and ACL refused to offer commercially viable slots which BA and ACL could feasibly have provided.  BA and ACL offered no legitimate business or other justification for its repeated refusals to provide access to Laker to competitive Gatwick slots in 1997.  BA and ACL offered Laker commercially viable slots in 1998 only after Laker was economically unable to compete with BA.

31.  BA's refusal of access to competitive Gatwick slots in 1997 severely handicapped Laker's ability to compete in the relevant market.  BA's refusal not only foreclosed Laker from effective competition, but suppressed competition generally in the relevant market to the detriment of the consuming public.  Laker has been injured in its business and property and has suffered antitrust injury as a direct and proximate result of such refusal and will continue to suffer such injury unless and until enjoined by this court.

16

## COUNT V

### Section 542.18 of the Florida Antitrust Act

32.  Laker repeats and realleges all of the foregoing allegations.

33.  BA and ACL have combined and conspired to restrain trade and commerce in the relevant market for air passenger service between Miami and London, in violation of Section 542.18 of the Florida Antitrust Act, Fla. Stat. § 542.18.  Competition in said market has thereby been unreasonably restrained, to the detriment of not only Laker but the consuming public generally, and said restraint will continue unless and until enjoined by this court.  Laker has thereby been injured in its business and property and has suffered antitrust injury, and said injury will continue unless and until enjoined by this court.

## COUNT VI

### Section 501.204 of the Florida Deceptive and Unfair Practices Act

34.  Laker repeats and realleges all of the foregoing allegations.

35.  BA has engaged in unfair methods of competition and has thereby suppressed competition in the provision of air passenger service between Miami and London, in violation of Section 501.204 of the Florida Deceptive and Unfair Practices Act.  Said violation will continue to suppress such

17

competition unless and until enjoined by this court.  Said violations has

caused injury to Laker's business and property, has caused Laker to suffer

antitrust injury, and will continue to do so unless and until enjoined by this

court.

36.  Laker is financially damaged by loss of passengers and passenger

revenue to BA and its other competitors.

37.  Laker demands a jury trial.

Wherefore, Laker demands:

(1)  Such damages as are determined at trial, trebled, plus costs

of suit including but not limited to attorneys' fees.

(2) A permanent injunction in such terms as the Court deems

necessary and appropriate.

18

(3)  Such other relief as the Court deems appropriate, just and

proper.

Respectfully submitted,

Robert M. Beckman
Bode & Beckman, L.L.P.
1150 Connecticut Avenue, N.W.
9th Floor
Washington, D.C.  20036-4192
Tel: 202-828-4100
Fax: 202-835-3219


Dwight Sullivan
(Florida Bar No. 079214)
14 Northeast First Avenue
Suite 1205
Miami, Florida 33132
Tel: 305-358-5544
Fax: 305-358-1614


By: Dwight Sullivan
Dwight Sullivan
Attorneys for Plaintiff,
    Laker Airways Inc.

Of counsel:

Robert A. Skitol
Drinker Biddle & Reath, L.L.P.
901 Fifteenth Street, N.W.
Suite 900
Washington, D.C.  20005
Tel: 202-842-8824
Fax: 202-842-8465

laker.amr\1997\amendedcompBA.wpd\mpc

## CERTIFICATE OF SERVICE

I hereby certify that on this _15TH_ day of October 1999, a copy of
Appellant's Amended Complaint was delivered by hand to Richard G.
Garrett and Steven S. Goodman, Greenberg, Traurig, Hoffman, Lipoff,
Rosen & Quentel, P.A., 515 East Las Olas Blvd., Fort Lauderdale, FL
33302 and by first class mail, postage prepaid to Daryl A. Libow, Esq.,
Sullivan & Cromwell, 1701 Pennsylvania Avenue, N.W., Washington,
D.C. 20006-2498. I also certify that a Summons and the Amended
Complaint were delivered by international registered mail to Peter
Morrisroe, Managing Director, Airport Coordination Limited, Axis
House, 242 Bath Road, Hayes, Middlesex, UB3 5AY, UNITED
KINGDOM. I further certify that a Summons, the Amended Complaint
and a Request for Service Form were sent in duplicate by international
registered mail to Her Majesty's Principal Secretary of State for Foreign
and Commonwealth Affairs, London SW1A 2AL, UNITED KINGDOM
and that a Summons, the Amended Complaint and a Request for
Service Form were sent in duplicate by international registered mail to
The Senior Master of the Supreme Court of Judicature, Royal Courts of
Justice, Strand, London WC2A 2LL, UNITED KINGDOM.


Dwight Sullivan, Esq.


laker.amr\1997\amendedcompBA.wpd\mpc